**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**ROBERT B. MELANE,**

       **Plaintiff,**

**vs.**                                       **Case No. 4:08cv486-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and benefits be awarded.

**Procedural status of the case**

Plaintiff, Robert B. Melane, applied for disability insurance benefits. His last date of insured status for disability benefits is March 31, 2007. Plaintiff was 53 years old at the time of the administrative hearing (on May 9, 2007), has a 12th grade education with two years of technical education in electronic assembly and mechanics, and has past

relevant work as a truck driver and an electronics mechanic.  Plaintiff alleges disability

due to diabetes, heart problems, and continued lower back pain after a lumbar

laminectomy and diskectomy with nerve root decompression at L4-L5 on January 31,

2003.

The Administrative Law Judge found that Plaintiff has the residual functional

capacity to do sedentary work, with restrictions.  Relying upon testimony from a

vocational expert, the ALJ determined that there are several jobs in the national

economy that Plaintiff can do within that limited sedentary residual functional capacity,

and thus was not disabled.  R. 24-25.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified that he injured his back in June, 2001. R. 443. He said he had not applied for jobs since his injury because he can "hardly get out of bed to go to work." *Id.* He said he cannot sit for more than an hour or two at a time, and cannot stand for more than a couple of minutes without extreme pain. R. 443-444, 461. He said he cannot walk more than 100 feet without becoming weak and a little dizzy. R. 462. He spends his time between sitting and lying down, "trying to stay out of pain." R.

444. Plaintiff said that he was suffering extreme pain after about an hour of sitting during the hearing. R. 452. He said that lying down was only good for a couple of hours, and he could not sleep longer than two hours due to pain. *Id.* He said he is constantly sleepy, cannot bend over, cannot stand up, cannot walk, cannot lift or push, and during the worst times, he cannot leave his home for a week. *Id.* Plaintiff said that he had to get up five or six times a night to alleviate pain, and does not get good sleep. R. 463. He said: "My whole day is pain." R. 465.

Plaintiff testified that his pain is located in his back, hips, and both legs. R. 458. He had shooting pains down his back into his legs, and his feet hurt and are swollen. *Id.* He said he could not wear regular shoes. *Id.* He was wearing bedroom slippers at the hearing. R. 468-469. He said that the pain was a constant sharp burning pain, a constant throbbing pain, and a shooting pain. R. 459. The pain became more intense when Plaintiff moved. *Id.*

Plaintiff said he could not afford the therapies that had been prescribed for him, and he received medication from the VA for the back pain. R. 452. He said that morphine was the only treatment that had had. R. 453-454. He had been taking morphine for three years. R. 459. Plaintiff had declined methadone because he did not want to be a drug addict. R. 460. He said he had nausea, diarrhea, and constipation from his medications. *Id.* He was prescribed physical therapy in Gainesville, but could not do that. R. 454. He said he had back surgery once, but it did "no apparent good." *Id.* He said that he had been told that chances for success for a second surgery were "very slim." *Id.*

Plaintiff testified that he worked four years for General Dynamics in the product reliability laboratory, testing heavy equipment for ability to withstand vibrations.  R. 444. The job required ability to lift from 80 to 200 pounds.  *Id.*  It was mostly a standing job involving a lot of heavy lifting, crawling, and climbing.  R. 445.  He did the same kind of work for other companies in Denver for 20 years.  R. 447.  His last job, that lasted only three weeks, was as a delivery driver, and he injured himself on that job.  *Id.*

Plaintiff said that he used to ski, mountain climb, backpack, and play tennis, but cannot do those things any more.  R. 464.  He  said that he only showers once a week or less because "it hurts too much."  R. 463.  He cannot tie his shoes.  *Id.*  He said he does not cook or wash dishes because he cannot stand that long.  R. 464.  Plaintiff also said that due to his high blood pressure, he had "blank spots [in his eyes] from blood vessels busting," and he had difficulty reading.  *Id.*  He said that he watches television "on occasion."  *Id.*  He does not drive much or go shopping.  R. 466.

**Medical evidence**

The medical evidence is adequately set forth in Plaintiff's memorandum.  Doc. 18, pp. 2-13.  The medical evidence will be discussed in greater detail ahead with respect to the issues raised.

**Legal analysis**

Plaintiff notes that at step 2, the ALJ found only that Plaintiff had the "severe" impairment of "status post lumbar laminectomy with nerve root decompression."  R. 17. Plaintiff argues, therefore, that the ALJ did not properly consider the post-surgical worsening of Plaintiff's spinal conditions.  Doc. 18, p. 15.  Plaintiff argues that this led to

the failure to give proper weight to the opinion of Plaintiff's treating physician, Dr. Panicker.  The two issues are related and will be considered together here.

At step 2, the question is whether Plaintiff has shown that he has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  A "severe" impairment is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working."  Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  A "severe" impairment has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so *slight* that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration."  Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities."  Flynn, 768 F.2d at 1275.  Impairments must be evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments must be evaluated in combination even though some impairments

are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The

Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-

articulated findings as to the effect of the combination of impairments when determining

whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.  On the other

hand, even if there is error at step 2, a remand is not needed if the error is harmless.

The error would be harmless if the ALJ considered the limiting effects of the impairment

at each succeeding step, along with other impairments.  Riepen v. Commissioner of

Social Sec., 198 Fed.Appx. 414, 415 (6th Cir. Oct 10, 2006) (not selected for publication

in the Federal Reporter, No. 05-2407); Reed-Goss v. Astrue, 291 Fed.Appx. 100, 101

(9th Cir. Aug 25, 2008) (not selected for publication in the Federal Reporter, No.

07-35477); Newton v. Astrue, 2008 WL 915923, *10 (N.D. Ga. Apr 01, 2008) (No.

CIV.A.1:06CV1542AJB).

It is also well-settled that the opinion of a claimant's treating physician must be

accorded considerable weight by the Commissioner unless good cause is shown to the

contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for

giving little weight to the opinion of a treating physician must be supported by

substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must

be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The

Secretary must specify what weight is given to a treating physician's opinion and any

reason for giving it no weight, and failure to do so is reversible error."  MacGregor v.

Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).   "Where the Secretary has ignored *or*

failed properly to refute a treating physician's testimony, we hold as a matter of law that

he has accepted it as true." *Id.* (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).

Plaintiff was injured at work on June 20, 2001, when he tripped when walking backwards pulling oxygen tanks. R. 111. A July 5, 2001, MRI revealed a left paracentral protrusion at L4-5 resulting in canal stenosis and left lateral recess stenosis with impingement of the left L5 nerve root. R. 109. There was also an asymmetric disc bulge to the right at L5-S1 resulting in "right-sided neural foraminal narrowing and mild flattening of the thecal sac." *Id.* Comparing to the 2001 MRI, it was noted after a May 16, 2002, MRI that "the disc bulge at L4-5 now could be considered a diffuse disc protrusion with facet osteoarthropathy and moderately severe stenosis." R. 105. The disc bulge at L5-S1 was seen to compromise the exiting L5 root on the right side. *Id.* By October 21, 2002, compression of the nerve root at L5 was again noted by MRI, and there was severe central canal stenosis at L4-L5 that had progressed since May, 2002. R. 107.

On January 31, 2003, Plaintiff underwent spinal surgery for disc herniation at L4-L5. R. 428. Sean F. Fitzgerald, M.D., performed a lumbar laminectomy, a diskectomy with nerve root decompression of the L5 nerve root, and placement of an epidural steroid. *Id.*

Plaintiff's "status post surgery" was that surgery did not work. Dr. Fitzgerald noted on March 19, 2003, that Plaintiff continued to have left leg symptoms, and some difficulty with bladder and bowel control. R. 367. Dr. Fitzgerald said that "he should be

better than what he is right now." *Id.* Another MRI was conducted on April 11, 2003, revealing continued disc protrusion at L4-L5 on the left. R. 104. This compressed the left S1 nerve in the thecal sac, and there was a disc fragment noted. *Id.* It did not look much different than on the October 21, 2002, MRI, even though this MRI was after surgery. *Id.* The image showed "the disc abnormality is probably recurrent." *Id.* The disc protrusion at L5-S1 was stable and unchanged, and determined to be "not touching the cord." *Id.*

On May 13, 2003, Plaintiff was examined by Oregon K. Hunter, M.D., in Ocala, Florida, for an independent evaluation. R. 111. Plaintiff complained of continuous severe pain (9 or 10 on a scale of 10) in his back and legs, greater on the left. *Id.* He said that the pain increased with standing, walking, driving, lifting, bending, or twisting. *Id.* He said that medications only helped minimally. *Id.* He had been taking Lortab and Soma, with only minimal relief of pain. R. 112. He was not doing physical therapy. *Id.*

Dr. Hunter reviewed the MRIs, observing the same progression of deterioration of Plaintiff's spine discussed above. R. 112. Dr. Hunter's review of systems noted back pain and decreased sleep. R. 113. He observed "moderate pain behavior," with difficulty getting on the examination table. *Id.* Antalgic gait on the left, and standing with weight shifted to the right, was observed. *Id.* Plaintiff had rigidity in his lower back, and was severely restricted in flexion and extension. *Id.* The straight leg raising test was positive on both the left and right. *Id.* Sensation was significantly lost "throughout the left lower extremity," and decreased in the right lower extremity. *Id.*

Dr. Hunter's diagnosis was chronic intractable pain syndrome, post-laminectomy syndrome, recurrent or residual L3-4 protrusion, right L5-S1 herniated nucleus pulposus, diabetes mellitus, and hypertension (poor control). R. 114. Plaintiff was then a smoker. *Id.* Dr. Hunter noted that Plaintiff was being considered for a repeat surgery, and might be a candidate for spinal fusion. *Id.* The surgical prognosis was guarded. *Id.* Dr. Hunter thought that Plaintiff should have aquatic physical therapy. *Id.*

Dr. Hunter said that Plaintiff's "work status" when he examined him was "sedentary," but he thought that Plaintiff was "unable to return to gainful employment even part-time without interruptions due to significant spinal involvement." R. 114 and 111 (correcting the sentence). Dr. Hunter said that Plaintiff's restrictions including "sedentary," but that he could not sit for a prolonged period, would need to change positions frequently, could not endure prolonged standing or walking, and "may need to [lie] down periodically throughout the day for pain management." R. 114.

On June 3, 2003, Dr. Fitzgerald noted the recurrence of the disc protrusion at L4-L5 and the disc fragment, and suggested that since the epidural had not lessened the symptoms, additional surgery was indicated to "remove that fragment to take the pressure off that exiting nerve root." R. 365. On June 25, 2003, Dr. Fitzgerald mentioned the second opinion of the "physician in Ocala" (Dr. Hunter), suggesting a spinal fusion. R. 364. He thought that "might be the best way to go with this guy," instead of a repeat of the last surgery. *Id.* He referred Plaintiff to Allen Dukes, M.D., since he no longer did fusion operations. *Id.*

On February 11, 2004, Plaintiff returned to Dr. Fitzgerald with increasing pain, on the left greater than the right, but the right side was now more "problematic." R. 362. Dr. Fitzgerald he thought that because the symptoms returned after the last surgery without any major trauma, Plaintiff had an unstable joint and needed fusion. *Id.* In the interim since Dr. Fitzgerald had seen Plaintiff, Plaintiff had gone to another neurosurgeon who had administered a set of epidurals "which had the same non-result," that is, no relief. *Id.* Percocet was prescribed, and Dr. Fitzgerald referred Plaintiff to George Arcos, M.D., for long term chemical pain management. *Id.*

Plaintiff was prescribed morphine by August 20, 2004, R. 292, and was prescribed liquid morphine 10 mg by September 23, 2004. R. 245. He was prescribed 15 mg of morphine every eight hours on October 13, 2004. R. 183. As will be discussed ahead in footnotes, it was during this period that Plaintiff had a myocardial infarction, a stent, and came under the care of Dr. Panicker at the VA.

On January 26, 2005, Plaintiff was examined on a consultative basis by Carla Holloman-Horton, D.O. R. 407. Dr. Holloman-Horton began by noting that Plaintiff was a poor historian. *Id.* He told Dr. Holloman-Horton that he had undergone two corrective surgeries for his spinal injury (which is not reflected in the medical record). *Id.* Dr. Holloman-Horton noted that Plaintiff had had a myocardial infarction, and he continued to have angina with "associated shortness of breath, diaphoresis, and radiation to the jaw. This happens to him daily, mostly with exertion. His symptoms are relieved with rest. He has multiple cardiac risk factors." *Id.* Dr. Holloman-Horton noted a past medical history of myocardial infarction, hypertension, coronary artery disease, chronic

low back pain, hyperlipidemia, tobaccoism, renal calculi, suspect COPD, and diabetes.

*Id.* She noted that Plaintiff had had back surgery and placement of a coronary stent. *Id.*

It was noted that Plaintiff had quit smoking in September, 2004. R. 408. On

examination, Plaintiff appeared to be alert and in no acute distress. *Id.* His gait was

normal, with no assistive devices. *Id.* He was 6' 1" tall and weighed 229 pounds. *Id.*

His heart rate and rhythm was regular and without murmurs, gallops, or rubs. *Id.*

Plaintiff was observed to stand from a seated position without difficulty. R. 409. The

straight leg raising test for back pain was positive on the right greater than the left. *Id.*

Dr. Holloman-Horton made no findings as to Plaintiff's residual functional capacity to

work.

On September 13, 2005, Plaintiff was seen at the VA clinic. R. 399. His

prescription for morphine was renewed, and it was noted that he had adequate pain

relief with the current dosage. *Id.*

On March 23, 2006, Plaintiff had another MRI of his spine. R. 431. It was noted

that the "T1 weighted sagittal sequences are degraded by motion artifact and are

nondiagnostic." *Id.* However, the "T2 sagittals" were only mildly degraded with motion

artifact. *Id.* Dr. Hatch, the Radiologist, found:

> 1. Large, left paracentral disc herniation at L4 5 with lateral recess
> stenosis and left foraminal stenosis impinging the exiting left L4 and
> descending left L5 nerve roots. Facet arthropathy contributes to severe
> central canal narrowing.
>
> 2. Foraminal protrusion at L5 1 impinges the exiting right L5 nerve root.

R. 432.

On March 5, 2007, Betsy E. Panicker, M.D., Plaintiff's treating physician at the VA clinic, filled out a "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment." R. 423. It is a checklist of a type that are commonly used to evaluate Social Security claimants. Dr. Panicker used this form to express her opinion that Plaintiff was not capable of performing sedentary or light work on a regular basis, 8 hours a day, 40 hours a week. R. 423-424. She said that her opinion would not change if Plaintiff had the freedom to alternate between sitting and standing during the workday. R. 424. She said that Plaintiff had a "moderately severe" inability to complete a normal workday and week without interruptions from medically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 425. "Moderately severe" was defined as serious interference with ability to perform the activity. *Id.* When asked for the date of the onset of the disability, Dr. Panicker said that Plaintiff was first seen by her in August, 2004, and she said that the disability6 had lasted or could be expected to last more than 12 months. R. 426. She said she based upon opinion upon a review of Plaintiff's medical records and history. *Id.*

In light of this evidence, the ALJ erred at step 2. The finding that Plaintiff had a "severe" impairment of "status post lumbar laminectomy with nerve root decompression" says nothing about the failure of that surgery and the severity of Plaintiff's continued spinal impairment. The only discussion that the ALJ provided with respect to the post-surgical condition of Plaintiff's spine was to find that after the surgery, "the claimant was still complaining of back pain," and "Dr. Fitzgerald opined that further surgery might be

needed." R. 18. He further said that Dr. Hunter thought that Plaintiff "should be evaluated for a fusion operation and should begin physical therapy." *Id.* He noted that Dr. Fitzgerald recommended "that the claim should be evaluated for a fusion operation" and referred Plaintiff to Dr. Arcos for pain management treatment. *Id.* None of this discussion reveals the significant medical evidence of Plaintiff's spinal impairment. This was not a matter of Plaintiff "still complaining of back pain" without evidence as to why. The MRIs from this period revealed significant nerve root impingement. Dr. Hunter thought that a spinal fusion was indicated, said Dr. Fitzgerald. Dr. Hunter's prognosis for such surgery was guarded. Dr. Fitzgerald plainly said that Plaintiff need that surgery.

Further, on May 13, 2003, Dr. Hunter determined that Plaintiff was "unable to return to gainful employment even part-time without interruptions due to significant spinal involvement." R. 114 and 111 (correcting the sentence). Dr. Hunter said that Plaintiff's restrictions including "sedentary," but that he could not sit for a prolonged period, would need to change positions frequently, could not endure prolonged standing or walking, and "may need to lay down periodically throughout the day for pain management." R. 114. The ALJ did not mention this opinion at all when he discussed the evidence from Dr. Hunter. R. 18.

The ALJ also discounted the March 23, 2006, MRI, which continued to show exactly the same nerve root impingement as in earlier MRIs. R. 20. He first discounted the MRI because he found that the images were of poor resolution due to Plaintiff's "body habitus." *Id.* That finding is not supported by substantial evidence in the record.

One aspect of the study was determined to be not diagnostic due to motion, not body habitus.  R. 431.  But one aspect of the study was adequately diagnostic because only mildly degraded by motion.  *Id.*

The ALJ also discounted the March 23, 2006, MRI results, because "Ms. Hatch," who interpreted the results, was only a "radiological technologist."  R. 20.  This is not supported at all.  The MRI states that Hatch is a "Staff Radiologist."  R. 432.  A "Radiologist" is a *physician* who specializes in radiology.[1]  Parlyn Denise Hatch, M.D., is a Radiologist in Daytona Beach, Florida, and works for the VA outpatient clinic there.[2]

In summary, in was error at step 2 for the ALJ not to have found that Plaintiff's deteriorating spinal condition after the surgery was a "severe" impairment.  This led to further error, a failure to discuss and give substantial weight to the opinion of Dr. Hunter, the findings of Drs. Hunter and Fitzgerald, and the 2006 MRI findings of Dr. Hatch.

Consequently, by the time the ALJ got to Dr. Panicker's opinion, he had failed to recognize the severity of Plaintiff's spinal problems.  The ALJ said that he rejected Dr. Panicker's opinion for the following reasons:

> First, the findings and limitations are totally conclusory.  Dr. Panicker fails to state or identify any medical or clinical findings to support his [sic] conclusion of limitation.  His findings of limitations are not supported by his treatment records which only show an objective finding of low back tenderness and calf discomfort.  Those objective findings do not support his conclusion in the form that he completed . . . .  Dr. Panicker completed

---

[1] This definition is found at: http://www.nlm.nih.gov/medlineplus/mplusdictionary.html See also: http://www.medterms.com/script/main/art.asp?articlekey=15892

[2] This information is available at the Florida Department of Health website, using the search feature, at:  http://ww2.doh.state.fl.us/IRM00PRAES/PRASLIST.ASP  A copy of this information is attached to this report and recommendation.  The information is also available at:  http://www.vitals.com/doctors/florida_h_17.html

this form on March 5, 2007 but completed the form based on her exam of October 19, 2004. Dr. Panicker's opinion is inconsistent with other objective medical evidence in the record like the consultative exam by Dr. Carla Holloman-Horton on January 25, 2006.

R. 20.

The ALJ's conclusions are not supported by substantial evidence in the record. The primary issue is whether the medical record supports the opinion of Dr. Panicker, a treating physician. A treating physician's opinion, if supported, will prevail over a consultative opinion.[3] Dr. Panicker said that she relied upon all of the medical records. That her own medical records contained little information about Plaintiff's deteriorating spine is understandable since she focused primarily upon treatment for Plaintiff's heart condition, poorly controlled diabetes, and visual problems; but even on these treatment occasions in which Dr. Panicker was involved, there were often notations about chronic back pain. R. 203-204 (August 23, 2004),[4] R. 262 (August 30, 2004),[5] R. 239-241

_____

[3] A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").

[4] Plaintiff had cardiac catheterization and stenting on August 24, 2004, as a result of this VA hospitalization following his myocardial infarction. R. 124. His major complaint during this hospitalization was chronic back pain. Id.

[5] Plaintiff was suffering dizziness, blurred vision, and had elevated blood sugar, and his diabetes was poorly controlled. R. 261-262. Dr. Panicker noted that he continued to have low back pain, and the morphine pills were not helping. R. 259.

(September 30, 2004),[6] R. 233 (October 19, 2004),[7] R. 376-377 (April 7, 2005),[8] R. 406 (May 1, 2005),[9] and R. 397 (May 31, 2005).[10] Therefore, the medical records both before and after Plaintiff's spinal surgery, fully support Dr. Panicker's opinion.[11]

The ALJ also said that he rejected Dr. Panicker's opinion because it was based on her examination on October 19, 2004, implying that that was the only basis for the opinion. R. 20. She did not say that. She said she had first seen Plaintiff in August, 2004, which is correct (R. 262), and based her opinion upon Plaintiff's history and review of his medical records. R. 426.

---

[6] Plaintiff had a loss of central vision in his right eye. R. 239. This was determined to be mild to moderate diabetic retinopathy. R. 237.

[7] Plaintiff continued to have low back pain. R. 233. He was seen by Dr. Panicker for his "chronic medical problems." *Id.* The back pain was continuing to get worse. *Id.* He said that he was told that there was nothing more that could be done for his back from a surgical point of view. *Id.* Plaintiff said he cannot walk more than a few 100 feet without chest pain. *Id.* On examination, Dr. Panicker found low back pain and discomfort in his calves. R. 234. Her assessment was coronary artery disease, with chest pain, diabetes, under better control, and chronic back pain. R. 234.

[8] Dr. Panicker requested a stress myocardial perfusion spect scan. R. 376-377. The test showed evidence of post-ischemic cardiomyopathy with multiple infarcts. R. 377.

[9] Plaintiff had called to report that he had a sharp pain in his head followed by dizziness, numbness in his legs, and an unstable gait. R. 406.

[10] Plaintiff had a follow up appointment with Dr. Panicker for his diabetes and cardiac condition. R. 397. He said his feet and legs were swelling up more lately, but his shortness of breath was no more than usual. *Id.* He continued to have chest pain and shortness of breath with exertion. *Id.* Plaintiff continued to have lower back pain. *Id.*

[11] As noted in footnotes 4 through 10 above, there is also substantial evidence in this record that Plaintiff has hypertension, diabetes, suffered a myocardial infarction, had to have an arterial stent placed, suffers continued shortness of breath upon any exertion, has chest pains, and has mild to moderate diabetic retinopathy.

In summary, the ALJ's findings at step 2 were erroneous and caused error at subsequent steps. If this were the only error, remand would be proper. However, the ALJ failed to give adequate reasons, supported by substantial evidence in the record, for rejecting the opinion of Dr. Panicker, the treating physician. As a matter of law, therefore, this court must accept Dr. Panicker's opinion as true. Elam v. Railroad Retirement Bd., 921 F.2d at 1217. There is even more reason in this case to do so as Dr. Panicker's opinion is exactly the same as the opinion of Dr. Hunter. Plaintiff cannot do sedentary work at all.

The court need not reach the last issue raised by Plaintiff, whether the ALJ erred in his rejection of Plaintiff's pain testimony.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge failed to correctly follow the law and were not based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on November 2, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 4:08cv486-MP/WCS

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.

**ATTACHMENT**

# License Verification
Data As Of **10/30/2009**

## PARLYN DENISE HATCH
LICENSE NUMBER: **ME84274**

**Profession**
MEDICAL DOCTOR

**License/Activity Status**

CLEAR/ACTIVE

**License Expiration Date**                     **License Original Issue Date**
1/31/2010                                        02/14/2002

**Discipline on File**
NO

**Address of Record**
DAYTONA BEACH OUTPATIENT CLINI
551 NATIONAL HEALTH CARE BLVD.
DAYTONA BEACH, FL   32114

The information on this page is a secure, primary source for license
verification provided by The Florida Department of Health, Division of
Medical Quality Assurance. This website is maintained by Division staff
and is updated immediately upon a change to our licensing and
enforcement database.

http://ww2.doh.state.fl.us/IRM00PRAES/prasindi_print_report.asp?LicId=79974&ProfN...   10/30/2009

Case No. 4:08cv486-MP/WCS